UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| AGNIESZKA KIJOWSKA, | ) | |
| --- | --- | --- |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 06-C-0478 |
| | ) | |
| TROY LEE HAINES, | ) | Judge Ruben Castillo |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

The Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), T.I.A.S. no. 11,670, 19 I.L.M. 1501 (Oct. 25, 1980), was designed to ensure that children who are wrongfully taken—usually by a parent—across international borders are promptly returned and to ensure that comity is given to custody orders issued by foreign courts. (*Id.* at art. 1.) The International Child Abduction Remedies Act, ("ICARA"), 42 U.S.C. §§ 11601 *et seq.*, which implements the Hague Convention, permits a person whose child has been abducted to the United States to petition a federal court for the child's return. 42 U.S.C. § 11603. Pursuant to the Hague Convention and ICARA, Agnieszka Kijowska has petitioned this Court for an order returning her daughter, Maya Kijowska-Haines, to what Kijowska alleges is Maya's habitual residence in Poland. Kijowska claims that Maya's biological father, Respondent Troy Lee Haines, wrongfully removed Maya to the United States on May 30, 2005, and has wrongfully retained her in Chicago since that date. This Court held an evidentiary hearing in this matter on May 10, 2006, and now issues its findings of facts and conclusions of law.

### FINDINGS OF FACT

Kijowska is a citizen of Poland. She came to the United States on July 5, 2002 on a

student visa. (R. 21-2, Pet.'s Br., Kijowska Aff. ¶¶ 3, 13.; Tr. at 68-69.) In 2004, Kijowska became pregnant with Haines's child. During Kijowska's pregnancy, Haines suggested that she either terminate the pregnancy or give the child up for adoption. (Tr. at 41; R. 31, Resp. ¶ 9.) Kijowska informed Haines while she was pregnant that she intended to leave the United States. (*Id.* at 44; 61.) Haines moved into the apartment where Kijowska was living on Hermitage Avenue in Chicago at the end of September 2004, when Kijowska was in her ninth month of pregnancy. (Tr. at 37.) On October 8, 2004, Kijowska gave birth to Maya. (R. 21-2, Pet.'s Br., Kijowska Aff. ¶ 9.) Kijowska refused to put Haines's name on Maya's birth certificate. (*Id.* at 41.) She told Haines that she did not put him on the birth certificate because she wanted to go to Poland in December. (*Id.* at 96.) She also refused to marry Haines. (*Id.* at 57.)

In November 2004, Kijowska worked as a babysitter and took Maya to work with her. (*Id.* at 38.) During the period leading up to December 4, 2004, Kijowska was the primary caretaker of Maya. (*Id.* at 41-42.) Haines occasionally watched Maya while Kijowska was at work, took Maya for walks, and changed her diapers. (*Id.* at 38-39.) Haines bought furniture and clothing for Maya. (*Id.* at 95.)

Around the end of November 2004, Kijowska was served with a summons and complaint stating that Haines was seeking an order of parentage with respect to Maya. (*Id.* at 42.) Haines was not seeking custody of Maya at this time, but Kijowska feared that was his intention. (*Id.* at 42, 98.) On Thanksgiving Day, Kijowska spoke to Haines's sister-in-law, Michelle Haines, about the complaint. (*Id.* at 42; 90.) Michelle told Kijowska that the paperwork did not say that Haines was seeking custody of Maya. (*Id.* at 93.) After this discussion, however, Kijowska continued to believe that Haines intended to take Maya away from her. (*Id.* at 43.) Haines had

2

threatened Kijowska that he would have her deported because her student visa was expired. (*Id.* at 60.) Kijowska had a real fear that Haines could have her deported at any time and that if she was deported she might never see Maya again. (*Id.* at 60-61.)

In November 2004, Kijowska obtained a passport for Maya at the Polish Consulate in Chicago without informing Haines. (*Id.* at 47.) She was able to do so because Haines was not listed as the father on Maya's birth certificate. (*Id.* at 41.) At the end of November, Kijowska and Maya left the apartment on Hermitage where they had been living with Haines. (*Id.* at 44.) She did not inform Haines that she was moving out before doing so. (*Id.*) On December 4, 2004, Kijowska took Maya to Poland. (*Id.* at 95.) She called Haines from the airplane at O'Hare airport to inform him that they were leaving. (*Id.*)

From December 2004 until May 30, 2005, Kijowska lived with Maya and her older daughter, Victoria, in Poznan, Poland. (Tr. at 4.) During this time, Kijowska was Maya's and Victoria's primary caregiver. (*Id.* at 31.) Maya and Victoria established a close bond. Every day, Kijowska would walk Victoria to work with Maya in the stroller. Victoria and Maya bathed together and played together. (*Id.* at 5.) During this period, Kijowska and Haines communicated via email. (*Id.* at 7.) Kijowska offered to let Haines speak to Maya over the phone but he declined. (*Id.* at 30.)

After Kijowska left the United States with Maya, Haines decided to try to obtain custody of Maya. (*Id.* at 119.) He did not inform Kijowska of this plan. (*Id.*) On December 29, 2004, Haines obtained an order from the Circuit Court of Cook County which stated that Kijowska's removal of Maya was wrongful and gave Haines custody of Maya. He obtained this order on an *ex parte* basis. Haines did not inform Kijowska that he was seeking or had obtained an order of

3

custody despite the fact that they were in contact. On or about March 12, 2005, Haines sent Kijowska an email in which he stated "good luck trying to prove I'm the father. [G]ood luck trying to find me! I [sic] move out soon!!!" (*Id.* at 8; R. 21, Pet.'s Br. Ex. 5, 11/03/05 email chain.) Haines also referred to Kijowska in this email by obscene and derogatory names. Kijowska understood this email to mean that Haines no longer wanted to be involved in Maya's life. (Tr. at 8.)

Nonetheless, the parties remained in contact and in May 2005 agreed that Kijowska would come to the United States. The purpose of this trip was for Haines to visit Maya, who was seven months old at that time. (Tr. at 10, 51.) Kijowska felt sorry that Maya and Haines had not seen each other and wanted Haines to be a part of Maya's life. (*Id.* at 48-49, 51-52.) She obtained a tourist visa for purposes of this visit. (*Id.* at 66.) Kijowska arranged for Victoria to stay with Kijowska's parents temporarily while she and Maya were in America.[1] (*Id.* at 68.)

On May 30, 2005, Kijowska and Maya landed in Detroit, Michigan. (*Id.* at 10.) Kijowska decided to fly to Detroit rather than Chicago because she was nervous about achieving

---

[1] Haines testified that Kijowska was coming to the United States so they could get married and be a family with Maya. We find that Kijowska's testimony that this trip was only meant to be a temporary visit is more credible. Kijowska obtained a tourist visa when she could have applied for a fiancé visa if she intended to marry Haines. She did not make arrangements for her older daughter to come to the United States. She had consistently refused to marry Haines up to this point. Haines admitted on the stand that he lied to immigration officers in the Detroit Airport, that he deceived Kijowska about the nature of the custody proceedings in Illinois, and that he made false or misleading statements in an affidavit to the Cook County Circuit Court. He also stated in his response brief that Kijowska was properly served with a complaint to establish his custody of Maya, but he admitted on the stand that she was never given notice of the custody proceedings. Additionally, Haines testified that he sent Kijowska an email disavowing his paternity and calling Kijowska obscene names because it was December, just after his baby had been abducted, and he was emotional. That email actually was sent three months after Maya left the country. Given Haines's pattern of less-than-truthful behavior and Kijowska's consistency on the stand, we simply find that Kijowska is the more credible witness.

4

entry to the United States given that she had previously overstayed her student visa. (*Id.* at 51.) Haines went to the Detroit Airport to meet Kijowska and Maya and he brought the custody order with him. (*Id.* at 102.) Haines knew that there was a chance that Kijowska would not be admitted into the United States. He brought the custody order because he planned to take Maya and keep her in the United States in the event that Kijowska was not admitted. (*Id.* at 113.) Haines did not inform Kijowska of this plan or tell her about the custody order. (*Id.* at 114.)

When Kijowska arrived at Customs in the Detroit Airport, an immigration officer asked her what her reason was for coming to the United States. (*Id.* at 11.) She told the officer that she had come to visit Haines. (*Id.*) The officer looked at Kijowska's passport and told her that she needed to speak with another immigration officer. (*Id.*) Meanwhile, when Kijowska and Maya did not appear with the other passengers on their flight, Haines asked to speak with the immigration officers. (*Id.* at 103.) Haines lied to an immigration officer by stating that he was Kijowska's husband. (*Id.* at 104.) When the officer caught him in this lie, Haines changed his story and told the officer that Kijowska and he were going to renew their vows. (*Id.*) The officer informed Haines that Kijowska was not going to be allowed into the country. (*Id.*) Haines then decided to try to retrieve Maya. He showed the officer the order giving him custody of Maya. (*Id.* at 105.) The officer then told Haines that he would be allowed to see Kijowska and Maya. The officer told Haines that if he wanted to take Maya, he should pick up the child, and once he had physical control of her, they would tell Kijowska about the custody order. (*Id.*)

Kijowska and Maya, meanwhile, were taken to a separate immigration office where they met with officer Kenneth Alvedy. (*Id.* at 12.) Though Kijowska had told the immigration officer that the purpose of her trip was to visit Haines, Alvedy was under the impression that Kijowska

5

had married Haines and was coming to renew her vows and stay in the United States. (*Id.* at 75-77.) Kijowska was found inadmissible for having the intent to stay in the United States when she was traveling with a non-immigrant tourist visa. (*Id.*)

Upon finding Kijowska inadmissible, Alvedy told Kijowska that she would have to return to Poland with Maya. (*Id.*) Kijowska asked Alvedy if it would be possible for Haines to come into the room just to see Maya, but Alvedy told her that was not possible. (*Id.* at 13-14.) Alvedy then received a phone call and Kijowska heard Alvedy say that Haines was on the phone and he had some documents for them to see. Sometime thereafter, Haines entered the room with his laptop and a large envelope. (*Id.*) Haines neither looked at Kijowska nor spoke to her. (*Id.* at 15-16.) Kijowska, Haines, Maya, Alvedy, and another immigration officer moved to a separate interview room. (*Id.* at 16.) At some point, Kijowska either handed Maya to Haines or Haines took Maya from the stroller. (*Id.* at 17, 105-106.)

In the interview room, Haines showed the immigration officers an order of the Circuit Court of Cook County dated December 29, 2004, granting him custody of Maya and a Petition for Entry of Protection and Entry of Order Pursuant to the Hague Convention filed in the Circuit Court of Cook County on January 20, 2005. (*Id.* at 18-19.) Kijowska had never seen these documents before. (*Id.*) No one showed these papers to Kijowska or explained them to her. (*Id.* at 19.) Alvedy told Haines to leave with the child. (*Id.* at 19-20.) When Kijowska realized what was happening, she became hysterical and begged them not to take Maya away from her. (*Id.* at 20-21.) Haines then left the room with Maya. (*Id.* at 21.) He did not take Maya's stroller, toys, medication, or other possessions. (*Id.*)

After Haines and Maya left, Kijowska asked to speak with the Polish Embassy or Polish

6

Consulate in Chicago but was refused until the evening when the Embassy was already closed. Kijowska spent the night at the Monroe County jail. (*Id.* at 23.) Kijowska called Haines from the jail but his phone was disconnected. (*Id.* at 22.) She then called Haines at Haines's brother's house but he told her that the collect call was too expensive and that he would call her back. (*Id.* at 23.) Haines tried to call her back, but the jail would not accept incoming calls. (*Id.* at 107.) The next contact Kijowska had with Haines was after she was deported and was in the airport in Frankfurt, Germany. (*Id.*) Both Haines and Kijowska cried during this call and Kijowska told Haines about Maya's needs and likes. (*Id.* at 24.)

After Maya's removal to the United States, Kijowska agreed to marry Haines. She made arrangements for their marriage in Poland. (*Id.* at 62.) Haines came to Poland without Maya between August 8-12, 2005. (*Id.* at 25.) He arrived with a prenuptial agreement which stated that:

> [t]he parties acknowledge that Troy has had physical custody of their child Maya Lee Haines, born October 8, 2004 since birth and has a Court Order granting him custody of the child. It is hereby stipulated and agreed that in the event of a dissolution or separation, that Troy will remain the custodial parent and that the child will continue to reside in the United States unless that [*sic*] is a showing by Order of Court that the minor child is in danger of being harmed physically by Troy.

(*Id.* at 26; R. 21-4, Pet.'s Br., Ex. 10.) This language was unacceptable to Kijowska because she understood it to mean that in the event of a divorce, she would have no rights to her child and that she could only be with her child as long as she was Haines's wife. (Tr. at 27.) Kijowska and Haines did not marry. (*Id.* at 63.)

At all times after Haines took Maya Kijowska has diligently worked for Maya's return. Immediately after she arrived back in Poland, Kijowska began searching the internet for any

7

agencies that could help her. (*Id.* at 28.) She sent letters to many human rights organizations in Europe seeking their help. (*Id.*) She eventually found counsel to help prepare her Hague petition through a legal assistance foundation. Kijowska is currently working in England to pay for costs associated with these proceedings. (*Id.* at 72.)

As of the date of the evidentiary hearing in this case, Kijowska had not seen Maya since Haines took Maya from the Detroit Airport on May 30, 2005. (*Id.* at 25.) Haines never brought Maya to visit Kijowska after this date. Haines allowed Kijowska to speak with Maya on the telephone "maybe twice" and refused to allow her to speak to the child in Polish. (*Id.* at 29-30.) Haines told Kijowska that not seeing Maya was the price she had to pay for leaving him. (*Id.* at 25.)

## CONCLUSIONS OF LAW

The purpose of the Hague Convention and its implementing statute is to provide for the prompt return of a child who has been wrongfully removed from her habitual residence. 42 U.S.C. § 11601. It is not this Court's role under the Hague Convention or ICARA to make any custody determinations, and accordingly we need not resolve questions such as who is the better parent or what are the child's best interests. *See* Convention, art. 19, 19 I.L.M. at 1503; 42 U.S.C. § 11601(b)(4). Instead, we must ask whether Kijowska has demonstrated by a preponderance of the evidence that: (1) Maya was a habitual resident of Poland on the date of her removal and retention in the United States; (2) Maya was wrongfully removed or retained from her habitual residence; and (3) Kijowska was exercising her rights of custody at the time of the wrongful removal. Convention, art. 3, 19 I.L.M. at 1501; 42 U.S.C. § 11603(e)(1)(A); *see also Fabri v. Pritkin-Fabri*, 221 F. Supp. 2d 859, 869 (N.D. Ill. 2001). If we find that Kijowska has

8

made the required showing, the Convention requires us to "order the return of the child forthwith."[2] Convention, art. 12, 19 I.L.M. at 1502.

I. **Habitual Residence**

The pivotal question in this case is whether on May 30, 2005—the date of her removal to the United States—Maya was a habitual resident of Poland within the meaning of the Hague Convention. The Hague Convention does not provide a definition for the term "habitual residence." Case law developed under the Hague Convention, however, has established that a child's "habitual residence" is the place where the child was living before the allegedly wrongful removal, rather than the place where the child has lived since the time of removal. *See Adams v. Naik*, 363 F. Supp. 2d 1025, 1028 (N.D. Ill. 2005); *Tabacchi v. Harrison*, 99 C 4130, 2000 WL 190576, at *8 (N.D. Ill. Feb. 10, 2000). "To determine habitual residence, the court must focus on the child, not the parents, and examine past experience, not future intentions." *Friederich v. Friederich*, 983 F.2d 1396, 1401 (6th Cir. 1993). "All that is necessary [to establish habitual residence] is that the purpose of living where one does has a sufficient degree of continuity to be

---

[2] We are required to order the return of a wrongfully removed child unless the respondent can establish one of four defenses set forth in the Hague Convention. *See* 42 U.S.C. §§ 11603(e)(2)(A) & (B); *Friedrich v. Friedrich*, 78 F.3d 1060,1067 (6th Cir. 1996). "Two of these defenses can be established by a preponderance of the evidence, 42 U.S.C. § 11603(e)(2)(B): the proceeding was commenced more than one year after the removal of the child and the child has become settled in his or her new environment, Hague Convention, Article 12; or, the person seeking return of the child consented to or subsequently acquiesced in the removal or retention, Hague Convention, Article 13a. The other two defenses must be shown by clear and convincing evidence, 42 U.S.C. § 11603(e)(2)(A): there is a grave risk that the return of the child would expose it to physical or psychological harm, Hague Convention, Article 13b; or, the return of the child 'would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms,' Hague Convention, Article 20." *Friedrich*, 78 F.3d at 1067. Haines has not asserted any of these defenses. Accordingly, our inquiry is limited to whether Kijowska has met her burden.

9

properly described as settled." *Tabacchi*, 2000 WL 190576, at *8 (quoting *Re Bates*, No. CA 122.2-89, High Court of Justice, Family Division Court, Royal Court of Justice, United Kingdom at 10, 1989). Essentially, the term "habitual residence" is the same as the child's ordinary residence at the time of the allegedly improper removal. *Miller v. Miller*, 240 F.3d 392, 400 (4th Cir. 2001).

If we consider Maya's circumstances without giving any credence to the manner in which she left the United States, we easily find that Maya was a habitual resident of Poland at the time Haines took her from Kijowska at the Detroit Airport. Kijowska testified that while she was pregnant with Maya, she informed Haines that she intended to return with the child to Poland. Maya resided in the United States for only eight weeks before Kijowska took her to Poland. The evidence indicates that Kijowska intended for Maya to live with her and her older daughter permanently in Poland. During the five and a half months that she lived in Poland, Maya formed a family unit with her mother and step-sister, who developed a close bond. There was significant continuity in her life in Poland as demonstrated by Kijowska's testimony regarding her routines of bathing Maya, taking her for walks, and allowing her older daughter and Maya to play together every morning. (Tr. at 5.) Before Haines abducted Maya, he repeatedly tried to get Kijowska to marry him and live with him in the United States. Kijowska consistently refused. The evidence strongly indicates that when Kijowska attempted to return to the United States in May 2005, it was for the purpose of a short visit to allow Haines to see Maya.[3] All of these facts lead us to

---

[3] Even if the evidence established that she was returning with the intent to marry Haines, however, that would not change our analysis of Maya's habitual residence because, as discussed above, we must focus not on the parents' future intent, but the child's past experience at the time of the wrongful removal. *Friederich*, 983 F.2d at 1401.

10

conclude that Maya was a habitual resident of Poland on May 30, 2005.

Haines argues that Maya's habitual residence cannot be Poland because "[b]ut for the Petitioner's illegal abducting of the child from the United States without the consent of Haines, the child would have been living in the U.S." (R. 31, Resp. Br. ¶ 32.) Haines's theory is that because Kijowska engaged in conduct that he considers wrongful within the meaning of the Hague Convention, we should ignore the above facts and conclude that the United States is Maya's habitual residence. Haines has cited no case law or statutory law to support his theory.

Our jurisdiction is limited by ICARA to considering the merits of claims brought in a petition under the Hague Convention. 42 U.S.C. § 11603. The Hague Convention does not state that we must consider the wrongfulness of the petitioner's prior conduct unless it falls within one of the defenses to return that Haines has not invoked. Our jurisdiction in this case necessarily is limited to a determination of the merits of Kijowska's petition. The removal that is at issue under Kijowska's petition is Haines's removal to and retention of Maya in the United States. Thus, under the Hague Convention we are bound to consider where Maya was habitually resident at the time of her allegedly wrongful removal to the United States. Convention, art. 3, 19 I.L.M. at 1501. For the reasons set forth above, we find that Maya is a habitual resident of Poland.

We are cognizant of the tension that our conclusion creates with the goals of the Convention, which are to "discourage abductions" and to deter a parent from "engaging in international forum shopping in custody cases." *Van de Sande v. Van de Sande*, 431 F.3d 567, 568 (7th Cir. 2005); *Baxter v. Baxter*, 423 F.3d 363, 367 (3rd Cir. 2005). In *Meredith v. Meredith*, 759 F. Supp. 1432 (D. Ariz. 1991), for example, the petitioner took her child to France ostensibly for a visit with family and then informed the respondent that she would not be

11

returning the child to their home in Arizona. The Petitioner then left for England without informing the respondent, and led the respondent to believe the child was still in France. *Id.* at 1433. The respondent effectuated service of custody papers on the petitioner and gained custody of the child in Arizona state court. *Id.* The respondent then traveled to England and regained physical custody of the child. *Id.* When the petitioner filed for return of the child under the Hague Convention, the district court found that the child had left the United States for the purpose of a holiday visit, and was only a temporary resident in France and England. *Id.* at 1435. The Court stated: "[t]o equate the temporary removal and subsequent sequestration of the minor child to legal status of 'habitual residence' in another country would be to reward Petitioner for her ability to conceal the child from the Respondent, her lawful, custodial parent." *Id.*

We find that the facts and circumstances of the present case are sufficiently distinguishable from *Meredith* to support our finding that Maya is a habitual resident of Poland even if we take into consideration Kijowska's actions in bringing Maya to Poland without Haines's prior consent. First, Kijowska has shown by a preponderance of the evidence that Maya's presence in the United States was never settled. During her pregnancy, Kijowska informed Haines that she intended to leave the United States. (Tr. at 44.) Kijowska told Haines that she was not listing him on the birth certificate because she intended to take Maya to Poland in December to be with Victoria. In December 2004, Haines had served Kijowska with a complaint to establish his paternity of Maya but had not moved for custody. Kijowska had consistently refused to marry Haines and made no attempt to procure legal permanent status in the United States. Kijowska had never made arrangements to have her older daughter, Victoria, come to the United States from Poland. Haines repeatedly threatened to have Kijowska deported

to Poland. Nothing in the evidence suggests that Maya's residence in the United States during the first eight weeks of her life was at all settled.

Second, even if we considered the United States—and specifically, Chicago—Maya's habitual residence at the time Kijowska took her to Poland, that taking would not be considered wrongful within the meaning of the Hague Convention because Haines was not exercising legally valid custody rights under the laws of Illinois in December 2004. Haines states in his response brief that he has rights as Maya's father "(A) by reason of birth, and (B) by order of Court." (R. 31, Resp. Br. ¶ 32.) On December 4, 2004, however, there was no court order recognizing Haines's parentage or giving him any rights of custody. Haines has provided no explanation of what legal rights to custody were his "by reason of birth." Haines was not named as the father on Maya's birth certificate at the time that Kijowska took Maya to Poland. Under Illinois law, the legal relationship existing between a father and child may be established by a presumption of paternity if one of four conditions exist, none of which are relevant here.[4] 750 ILCS §§ 45/2, 45/4, 45/5. Absent those conditions, the natural father's relationship can be established by consent of the parties or through a court action to establish paternity. *Id.* §§ 45/6, 45/7. Though Haines had initiated an action to establish his parentage by December 4, 2004, he did not yet have legal status with respect to Maya and had not sought custody of the child. The fact that

---

[4] A presumption that a man is the natural father of a child exists where: "(1) he and the child's natural mother are or have been married to each other . . . and the child is born or conceived during such marriage; (2) after the child's birth, he and the child's natural mother have married each other . . . and he is named, with his written consent, as the child's father on the child's birth certificate; (3) he and the child's natural mother have signed an acknowledgment of paternity in accordance with rules adopted by the Illinois Department of Public Aid under Section 10-17.7 of the Illinois Public Aid Code; or (4) he and the child's natural mother have signed an acknowledgment of parentage . . . ." 750 ILCS § 45/5.

13

Kijowska was able to obtain a passport for Maya without Haines's consent supports this conclusion because under the State Department's rules for the issuance of passports, "[a]ll applications for children under 14 require both parents' or legal guardians' consent." *See* Special Requirements for Children Under Age 14, http://travel.state.gov/passport/get/first/first_830.html. Without establishing that the law recognized Haines's paternity of Maya on December 4, 2004, Haines cannot establish that he was exercising valid custody rights under Illinois law with respect to Maya on that date.

The fact that Haines subsequently obtained an order from the Circuit Court of Cook County establishing his paternity of Maya, granting Haines custody of Maya, and stating that Kijowska's removal of Maya from the United States was wrongful does not change our analysis. Article 17 of the Hague Convention specifically states that:

> [t]he sole fact that a decision relating to custody has been given in or is entitled to recognition in the requested State shall not be a ground for refusing to return a child under this Convention, but the judicial or administrative authorities of the requested State may take account of the reasons for that decision in applying this Convention.

Convention, art. 17, 19 I.L.M. at 1503. Here, we find that the Illinois Court order is irrelevant to the question of whether Kijowska's removal of Maya to Poland was wrongful because it was issued on December 29, 2004, after the date of the removal. Haines admitted on the stand that he never sought custody of Maya until after she was in Poland, that he never informed Kijowska of his decision to seek custody and that Kijowska never received notice that he had filed for custody. (Tr. at 119.) Though the court order states that Kijowska's removal of Maya was "wrongful," it neither invokes the Hague Convention nor orders Maya's return to the United

14

States.[5]  Haines obtained the state court order surreptitiously despite the fact that he was in regular contact with Kijowska in Poland.  Haines then encouraged Kijowska to come to the United States knowing that if she was refused entry he would use the order to take Maya away from her.  Given these circumstances, we do not find that Haines was exercising valid custody rights to Maya at the time Kijowska removed Maya to Poland.

Third, unlike the petitioner in *Meredith*, Kijowska never attempted to hide Maya's whereabouts from Haines or to prevent him from seeing her.  Kijowska credibly testified that she wanted Haines to be a part of Maya's life and tried to facilitate that role for him.  She attempted a visit with Haines in the United States which resulted in the relevant abduction.  She repeatedly offered to allow Haines to speak to Maya on the phone but he was uninterested.  Even after Haines obtained an *ex parte* custody order in Illinois, he wrote Kijowska an email stating "good luck trying to prove I'm the father. [G]ood luck trying to find me!  I [*sic*] move out soon!!!" (R. 21-2, Pet.'s Br., Ex. 5.)  In this case, Haines is the party who has wrongfully sequestered the child.  He testified that he planned to take Maya at the Detroit Airport if Kijowska was denied entry to the United States and admitted that he never informed Kijowska of this plan when she

---

[5] As an exhibit to his Answer, Haines attached a document entitled "Petition for Entry of Protection and Entry of Order Pursuant to the Hague Convention" which contains a stamp showing it was filed in the Cook County Circuit Court on January 20, 2005. (R. 18, Answer, Ex. A.)  There is no explanation of this document anywhere in Haines's answer or response brief.  Though Kijowska testified that Haines showed the petition to the immigration officers in the Detroit Airport, there was no other reference to the document during the evidentiary hearing.  There is no evidence to show whether proceedings were held with respect to this petition or whether an order was issued.  Given these circumstances, the petition serves only to demonstrate that Haines was aware of the protections available to him under the Hague Convention but chose to encourage Kijowska to bring Maya to the United States without informing her of the custody order or his intent to keep Maya and then blind-sided Kijowska by physically removing Maya from Kijowska's care.

15

decided to come to the United States. He physically took Maya from Kijowska's custody at the Detroit Airport even though he admits he had the choice to allow Maya to return to Poland with Kijowska, where he could have contested custody. He has refused Kijowska any visitation with her daughter over the past year. He only allowed Kijowska to speak on the phone to Maya "maybe twice" and refused to let her speak to Maya in Polish. (Tr. at 29.) Haines went so far as to travel to Poland to try to get Kijowska to marry him—under the condition of a prenuptial agreement denying Kijowska all custody rights to Maya in the event of a divorce—without bringing Maya with him. In this case, it is Haines who is more like the petitioner in *Meredith* because it is he, not Kijowska, who has concealed and sequestered the minor child away from her custodial parent.

We find that the only relevant removal for purposes of the present petition is Haines's removal and retention of Maya in the United States on May 30, 2005 and thereafter. At that time, Maya was a habitual resident of Poland. Even if we consider the facts and circumstances surrounding Maya's move to Poland, we still conclude that Maya was insufficiently settled in the United States in December 2004 to establish her habitual residence here. Further, we find that Kijowska had sole physical custody of Maya in December 2004 and that Haines did not exercise valid custody rights to Maya before she left for Poland. Accordingly, Kijowska's removal of Maya to Poland was not wrongful within the meaning of the Hague Convention and we will not for reasons of equity disregard the subsequent time in which Maya was settled in Poland.

## II.  Wrongful Removal or Retention and Petitioner's Valid Exercise of Custody Rights

Having concluded that Maya's habitual residence is Poland, we are left to determine only whether Haines's removal and retention of Maya in the United States since May 30, 2005 was

16

wrongful. As stated above, removal and retention is considered wrongful under the Hague Convention where:

> (a) it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and (b) at the time of removal or retention those rights were actually exercised . . . . The rights of custody . . . may arise in particular by operation of law . . . .

Convention, art. 3, 19 I.L.M. at 1501. Kijowska has established by a preponderance of the evidence that her custody rights to Maya arise under operation of Polish law simply by virtue of the fact that she gave birth to Maya. (*See* R. 21-1, Pet.'s Br., Ex. 16, Certificate of Parental Power.) Haines has not contested the fact that Kijowska was exercising those custody rights at the time he removed and retained Maya in the United States. The evidence clearly indicates that until May 30, 2005 Kijowska was Maya's primary caretaker. Accordingly, we find that Haines's removal of Maya to the United States on May 30, 2005 and subsequent retention of Maya in Chicago is wrongful under Article 3 of the Hague Convention. Because Haines has not asserted any of the defenses to return set forth in the Hague Convention, we are bound by this determination to order Maya's return to Poland for the purposes of any future custody determinations. Convention, art. 12, 19 I.L.M. at 1502.

## CONCLUSION

For the reasons set forth above, we find that Haines is wrongfully retaining Maya away from her habitual residence in Poland in violation of Kijowska's valid custody rights under Polish law, which she was exercising at the time of Maya's removal. Accordingly, we find that Maya must be returned to her habitual residence in Poland and we grant Kijowska's petition. (R. 1-1.) Sadly, this Court recognizes that this order may not put an end to the international tug-of-

war to which Maya has been subjected essentially from birth. Under the provisions of ICARA, however, our order of Maya's return to Poland ends our jurisdiction over these matters and it will be the task of the courts of Poland—if their jurisdiction is invoked—to determine where custody properly lies. It is this Court's hope that those matters will be concluded in due course so that Maya may enjoy the stability and security that every child deserves.

ENTERED:

**Judge Ruben Castillo**
**United States District Court**

**Dated: May 18, 2006**